UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IOANA CONLEY and ALEXANDER CONLEY, Plaintiffs, v. ROSELAND RESIDENTIAL TRUST and REALPAGE UTILITY MANAGEMENT INC., Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 18-10629-WGY |

YOUNG, D.J.                                          March 5, 2020

## MEMORANDUM & ORDER

### I.    INTRODUCTION

This landlord-tenant case is a purported class action brought by Ioana and Alexander Conley ("the Conleys") against their former landlord, Roseland Residential Trust ("Roseland"), and its billing contractor, RealPage Utility Management ("RealPage").  The Conleys allege that Roseland and RealPage wrongly charged them for gas and water utilities for nearly four years in their apartment because of unlawful "submetering" systems.  On behalf of themselves and a class of thousands of similarly situated tenants, the Conleys assert claims of unfair and deceptive practices under Mass. Gen. Laws ch. 93A, § 2 and negligent misrepresentation.  Pending before this Court are the

Conleys' motion for class certification and all parties' cross-motions for summary judgment.

For the reasons that follow, the Court DENIES the motion for class certification and GRANTS the motions of Roseland and RealPage for summary judgment.

## A.  Undisputed Facts

In July 2014, Ioana Aprodu (later Conley) moved into 16 Quarry Lane Apartment 4409, Malden, Massachusetts ("the Apartment") with her sister, Adela.  Def. Roseland's Statement Undisputed Material Facts Supp. Mot. Partial Summ. J. ("Roseland's Statement Facts") ¶ 1, ECF No. 81; Pls. Ioana Conley's and Alexander Conley's Statement of Undisputed Material Facts Supp. Partial Mot. Partial Summ. J. Against Def.'s Roseland ("Pls.' Statement Facts") ¶ 1, ECF No. 75.  That building, called the Chase at Overlook Ridge, was owned and managed by Roseland.  Pls.' Statement Facts ¶ 7.  In January 2016, the two sisters were joined in the Apartment by Ioana's then-boyfriend (now husband), Alexander Conley.  Roseland's Statement Facts ¶ 3.  The Conleys lived in the Apartment until February 2018.  Id. ¶ 5.

Over nearly four years, Ioana, Adela, and Alexander executed a series of leases for the Apartment with the proviso that "Owner will send a bill to Resident for the monthly gas heat, hot water, and water and sewer use."  Roseland's Statement

Facts ¶ 7.  The leases described in detail the building's
process of submetering gas and water utilities.  Id.  The leases
explained that the Apartment's "gas furnace is monitored by an
Energy Cost Allocation system to determine the amount of time,
each monthly billing period, that gas is combusted by furnace to
heat the Apartment," and "[t]he gas used to heat vacant
apartments and common areas of the building (if any) is
monitored and allocated by exactly the same method and is paid
for by the Owner"; the leases further explained that water
consumption "is monitored by a utility grade water meter to
measure the amount of water consumed in the Apartment" and that
the water submetering complied with applicable state law
requirements.  Id.; Pls.' Statement Facts ¶¶ 12-13.

In general, the submetering proceeded in practice as
described in the leases.  See Roseland's Statement Facts, Ex. D,
Deposition of Ioana Conley 62:10-16, ECF No. 81-4.  Roseland did
not itself bill the Conleys for utilities each month but instead
hired a contractor, RealPage, to handle the calculations and
billing of utilities.  Def. RealPage Utility Management, Inc.'s
Statement of Undisputed Facts ("RealPage's Statement Facts") ¶
6, ECF No. 86.  Although RealPage sent paper bills in the mail,
the Conleys' payments were made through an online portal
maintained by Roseland.  Id. ¶¶ 18-20.  The Conleys paid their

submetered utility bills each month throughout their tenancy. Pls.' Statement Facts ¶¶ 20-22.

There were some deviations from the lease, however. First, Roseland did not actually monitor the gas heat used in vacant apartments and common areas of the building; instead, in an effort to avoid billing tenants for gas that they did not use, RealPage simply lopped 40% off the top of the bill to be charged to tenants, which RealPage regarded as a "quite generous" estimate of the non-tenant gas consumption. Roseland's Statement Facts ¶ 46; Pls.' Mem. Roseland, Ex. 35,[1] Deposition of Amye Baker 80:4-11, ECF No. 79-35. Despite this peculiar

---

[1] The briefs on these motions will be cited as follows. Pls.' Mem. Supp. Mot. Summ. J. Def. Roseland Residential Trust ("Pls.' Mem. Roseland"), ECF No. 74; Pls.' Mem. Supp. Mot. Summ. J. Def. RealPage Utility Management, Inc. ("Pls.' Mem. RealPage"), ECF. 79; Def. Roseland Residential Trust's Supp. Mot. Partial Summ. J. ("Roseland's Mem."), ECF No. 78; Mem. L. Supp. Def. RealPage Utility Management, Inc.'s Mot. Summ. J. ("RealPage's Mem."), ECF No. 83; Def. Roseland Residential Trust's Opp'n Pls.' Mot. Partial Summ. J. ("Roseland's Opp'n"), ECF No. 89; Pls.' Opp'n Roseland Residential Trust's Mot. Partial Summ. J. ("Pls.' Opp'n Roseland"), ECF No. 92; Pls.' Opp'n RealPage Utility Management, Inc.'s Mot. Partial Summ. J. ("Pls.' Opp'n RealPage"), ECF No. 94; RealPage Utility Management, Inc.'s Mem. L. Opp'n Pls.' Mot. Summ. J. ("RealPage's Opp'n"), ECF No.96; Def. Roseland Residential Trust's Reply Pls.' Opp'n Roseland's Mot. Summ. J. ("Roseland's Reply"), ECF No. 100; Reply Mem. L. Further Supp. Def. RealPage Utility Management, Inc.'s Mot. Summ. J. ("RealPage's Reply"), ECF No. 103; Pls.' Reply Def. Roseland Residential Trust's Opp'n Pls.' Mot. Partial Summ. J. ("Pls.' Reply Roseland"), ECF No. 101; Pls.' Reply Def. RealPage Utility Management, Inc.'s Opp'n Pls.' Mot. Partial Summ. J. ("Pls.' Reply RealPage"), ECF No. 102.

practice, or perhaps because of it, the Conleys have not alleged that they paid for utilities that they did not use. See Roseland's Statement Facts, Ex. E, Deposition of Alexander Conley 59:8-20, ECF No. 81-5. The Conleys assert that because Roseland did not monitor the vacant units and common areas, no one really knows whether the Conleys paid for more gas than they used. See Pls.' Mem. Roseland 3-4.[2]

A second deviation from the lease was that Roseland's water and sewer submetering did not comply with state law. See Mass.

---

[2] The Court takes as undisputed fact that the Conleys did not pay more for utilities than they had contracted to pay. At times, the Conleys appear to argue that the formula for calculating their utility charges was misrepresented, and as a result they might have paid more than they should have according to their lease. See Pls.' Mem. RealPage 5 ("RealPage passed on costs for common area usage, as well as taxes and customer service charges. . ."); id. 8-9 ("[RealPage]'s representations as to the amount of each bill were false because they were based on an incorrect formula which overrepresented how much each Tenant could be billed."); Pls.' Reply RealPage 5-6. For all their quibbles with the formula used to bill them, however, the Conleys have failed to put forth any facts showing that, in the final analysis, they paid for utilities that they did not use. In fact, Alexander Conley denied that this was the case. See Roseland's Statement Facts, Ex. E, Deposition of Alexander Conley 59:8-20, ECF No. 81-5.

The Conleys' arguments regarding the calculation of charges are thus little more than smoke, and this Court need not permit them to go to trial. See Fed. R. Civ. P. 56(e)(2) (assertion of fact not properly supported may be considered undisputed for purposes of motion for summary judgment); Morris v. Government Dev. Bank of P.R., 27 F.3d 746, 748 (1st Cir. 1994) (summary judgment is appropriate when no "genuine dispute as to material fact," where "'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party").

Gen. Laws ch. 186, § 22. Specifically, Roseland concedes that it did not file the necessary certifications with a board of health until March 2018, after the Conleys had already left. Pls.' Mem. Roseland, Ex.5, Def. Roseland Residential Trust's Answers Pl. Alexander Conley's First Set of Interrogatories ("Roseland's Interrogatory Answers"), Interrogatory 2, ECF No. 74-5.

In March 2013, Roseland was granted a variance by the Malden Board of Health from the ordinary restrictions on gas submetering found in the State Sanitary Code. See 105 CMR 410.354; Roseland's Statement Facts, Ex. G 1, ECF No. 81-7. The Malden variance was addressed to Roseland's attorney, Thomas Callaghan, and covered several Roseland properties in Malden, including 16 Quarry Lane, "allow[ing] for the use of a master gas meter and the automated Energy Cost Allocation System." Id.

A few months later, on September 5, 2013, the Massachusetts Department of Public Health issued a memorandum to "[a]ll local Boards of Health and Health Departments" stating that "[a]ny variance granted by a board of health for submetering of electricity or gas is invalid." Pls.' Statement Facts Roseland ¶¶ 107-109; Pls.' Mem. Roseland, Ex. 27, Memorandum Re: Submetering of Electricity and Gas ("DPH Memo") 1-2, ECF No. 74-27). Malden's Director of Public Health forwarded the memorandum to Roseland's attorney the same day and Joe Shea,

Roseland's Senior Vice President/Operating Manager, received it by October 1, 2013.  Pls.' Statement Facts Roseland ¶¶ 110-111. On October 10, 2014, Roseland's Regional Director of Massachusetts, P.J. Lefort, wrote an email to the company's Senior Vice President of Operations stating that the Malden gas submetering variance was "illegal" and "should never have been permitted."  Id. ¶ 115.

### B.  Procedural History

In March 2018, the Conleys filed putative class-action claims against their former landlord, Roseland, and Roseland's third-party billing contractor, RealPage (formerly known as NWP Services Corporation) in Massachusetts Superior Court.  Notice of Removal, Ex. A, Pls.' First Am. Class Action Compl. and Demand for Jury Trial ("FAC"), ECF No. 1-1.  Roseland then removed the case to this Court under the Class Action Fairness Act, ECF No. 1, and soon afterward both Roseland and RealPage filed motions to dismiss, ECF Nos. 14, 17.  After a hearing on September 25, 2018, this Court granted in part Roseland's and RealPage's motions to dismiss, reducing the Conleys' claims to ten against Roseland and three against RealPage.  ECF No. 38.

The Conleys filed a motion to certify the class in January 2019, ECF No. 47,[3] and a hearing was held on June 5, 2019, ECF

---

[3] The parties fully briefed the issues.  Pls' Mem. Supp. Class Cert. ("Class Cert. Mem."), ECF No. 46; Def. Roseland's

No. 69. The motion was denied in part but taken under advisement as to the submetering claims. Electronic Clerk's Notes, ECF No. 69. On July 26, 2019, the Conleys moved for partial summary judgment against Roseland, ECF No. 73, and against RealPage, ECF No. 76. On the same day, Roseland moved for partial summary judgment against the Conleys on all the submetering counts, ECF No. 77; and RealPage moved for full summary judgment against the Conleys, ECF No. 82.

The Court heard oral argument on the motions for summary judgment on October 8, 2019 and gave the parties 60 days to negotiate a settlement. ECF Nos. 110, 111. In a subsequent update, the parties informed the Court that they will settle the claims relating to counts X through XIV, leaving only the counts based upon the water, sewer, and gas submetering systems. ECF No. 115. Accordingly, five counts remain against Roseland: Count II (negligent misrepresentation for gas submetering); Count III (violation of chapter 93A for gas submetering); Count VI (negligent misrepresentation for water and sewer submetering); Count VII (violation of chapter 93A for water and

Opp'n Pl.'s Mot. Class Cert. ("Roseland's Opp'n Class Cert."), ECF No. 53; Def. RealPage Opp'n Pl.'s Mot. Class Cert. ("RealPage's Opp'n Class Cert."), ECF No. 55; Pls.' Reply Roseland Opp'n Pls.' Mot. Class Cert. ("Pls.' Reply Class Cert. Roseland"), ECF No. 63; Pls.' Reply RealPage Opp'n Pls.' Mot. Class Cert. ("Pls.' Reply Class Cert. RealPage"), ECF No. 64.

sewer submetering); Count VIII (violation of chapter 93A for water and sewer submetering). Two counts remain against RealPage: Count II (negligent misrepresentation for gas submetering); Count VI (negligent misrepresentation for water and sewer submetering).

## II. **CLASS ACTION CERTIFICATION**

The Conleys propose to certify the following class, as relevant to the remaining counts, under Rule 23 of the Federal Rules of Civil Procedure: "All current and former residential tenants who [w]ere charged for gas, water and/or sewer submetered services by Roseland and/or [RealPage]." Class Cert. Mem. 4.[4] For the reasons that follow, the Court DENIES the motion to certify the class.

### A. **Standard of Review**

---

[4] The Conleys also seek to certify the class under the "less stringent certification standard" of Mass. Gen. Laws ch. 93A, § 9(2), which does not require predominance and superiority. See Class Cert. Mem. 19; Bellermann v. Fitchburg Gas & Elec. Light Co., 470 Mass. 43, 52-53, 18 N.E.3d 1050 (2014). Of course, in federal court it is Rule 23, not chapter 93A, that typically governs. See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co., 559 U.S. 393, 406 (2010). Due to the Court's conclusion that the chapter 93A sub-class may not be certified under Rule 23 on grounds common to both standards, the Court has no occasion to consider whether chapter 93A's special class certification procedure is "so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy" and thus applies in federal court. Id. at 420 (Stevens, J., concurring); cf. In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 408-09 (D. Mass. 2013), aff'd, 842 F.3d 34 (1st Cir. 2016).

"A plaintiff who seeks to certify a class action has the
burden of demonstrating that four prerequisites enumerated in
Federal Rule of Civil Procedure 23(a), plus one of the
provisions of Federal Rule of Civil Procedure 23(b), are
satisfied." In re TJX Cos. Retail Sec. Breach Litig., 246
F.R.D. 389, 392 (D. Mass. 2007) (citing Smilow v. Southwestern
Bell Mobile Sys., Inc., 323 F.3d 32, 38 (1st Cir. 2003)). Rule
23(a) permits class certification only if:

> (1) the class is so numerous that joinder of all
> members is impracticable; (2) there are questions of
> law or fact common to the class; (3) the claims or
> defenses of the representative parties are typical of
> the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately
> protect the interests of the class.

Fed. R. Civ. P. 23(a).

In addition to establishing these four elements, the
Conleys must satisfy one of Rule 23(b)'s categories.  As
relevant here, the Conleys must show "that the questions of law
or fact common to class members predominate over any questions
affecting only individual members, and that a class action is
superior to other available methods for fairly and efficiently
adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  "The
aim of the predominance inquiry is to test whether any
dissimilarity among the claims of class members can be dealt
with in a manner that is not 'inefficient or unfair.'"  In re
Asacol Antitrust Litig., 907 F.3d 42, 51 (1st Cir. 2018)

(quoting Amgen, Inc. v. Connecticut Ret. Plans & Tr. Funds, 568
U.S. 455, 469 (2013)). The "focus of the predominance inquiry"
is whether "a proposed class is 'sufficiently cohesive to
warrant adjudication by representation.'" Amgen, 568 U.S. at
469 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623
(1997)).

Though a court's analysis of a potential class ought be
"rigorous," "it should inquire into the merits of the action
only 'to the extent that the merits overlap with Rule 23
criteria.'" In re Celexa & Lexapro Mktg. & Sales Practices
Litig., 315 F.R.D. 116, 121 (D. Mass. 2016) (Gorton, J.)
(quoting In re Boston Sci. Corp. Sec. Litig., 604 F. Supp. 2d
275, 281 (D. Mass. 2009) (Woodlock, J.) & In re New Motor
Vehicles Canadian Export Antitrust Litig., 522 F.3d 6, 24 (1st
Cir. 2008)).

### B.    Analysis

The Court need not tarry on the Rule 23(a) requirements of
numerosity and commonality because they are easily met here for
the reasons the Conleys outline, Class Cert. Mem. 5-16, and
neither Roseland nor RealPage argues otherwise. Instead, both
Roseland and RealPage focus their attack on Rule 23(b)(3)'s
requirement of predominance.[5] The gist of their argument is that

---

[5] RealPage also attacks the superiority prong of Rule
23(b)(3) but does so for reasons that mirror its line of

the Conleys' claims require individualized assessments of injury
and damages, as well as causation and reliance, that preclude
class certification. See RealPage's Opp'n Class Cert. 7-18;
Roseland's Opp'n Class Cert. 6-12; Shaulis v. Nordstrom, Inc.,
865 F.3d 1, 7-10 (1st Cir. 2017) (discussing injury requirement
under chapter 93A); Gossels v. Fleet Nat'l Bank, 453 Mass. 366,
371-72, 902 N.E.2d 370, 377 (2009) (pecuniary loss, causation,
and justifiable reliance are elements of negligent
misrepresentation claim in Massachusetts).

The Court disagrees with Roseland and RealPage primarily
because of the very narrow theory of liability that the Conleys
have plausibly alleged. The Conleys have not alleged that any
tenants were overcharged on their utilities as compared with
either the market rate or the lease's terms. Rather, the
Conleys' theory of liability is that it was unlawful for the
defendants to bill any of these tenants at all for submetered
utilities, since the submetering systems did not comply with
Massachusetts regulations. These questions could be litigated
with a cohesive class even if the precise injuries vary with
individual factors, such as the length of tenancy and usage of
utilities in a particular unit. The Court sees no reason why

---

argument regarding predominance. See RealPage's Opp'n Class
Cert. 18-20. Accordingly, the Court's analysis of the
predominance prong applies to superiority as well.

each plaintiff's allegedly unlawful payments could not be calculated individually following a class-wide determination of liability.  See In re Asacol, 907 F.3d at 52 ("[A] class may be certified notwithstanding the need to adjudicate individual issues so long as the proposed adjudication will be both 'administratively feasible' and 'protective of defendants' Seventh Amendment and due process rights.'" (quoting In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015))); In re Nexium, 777 F.3d at 21 ("[I]t is well-established that "[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3).'" (alteration in original) (quoting Smilow, 323 F.3d at 21)).  This takes care of the defendants' objections to certifying the class as to the chapter 93A claims.

As for the negligent misrepresentation claims, the defendants point to the fact that each plaintiff must prove justifiable reliance and causation, reminding this Court of its reasoning in In re TJX Cos. Retail Sec. Breach Litig. that questions of reliance and causation in misrepresentation actions are "not amenable to determination on a class-wide basis."  246 F.R.D. 389, 396 (D. Mass. 2007).  Yet the TJX case is distinguishable.  That case involved an enormous data breach of millions of credit and debit accounts, spawning multi-district litigation on two separate tracks: the Consumer Track and the

Financial Institutions Track. <u>In re TJX</u>, 524 F. Supp. 2d 83, 86 (D. Mass. 2007). After the Consumer Track settled, only the financial institution plaintiffs remained. That was the context in which this Court determined that the individualized nature of reliance and causation ruled out a class action, for the analytical processes of those highly sophisticated financial entities required a "bank-by-bank" determination of whether, and how, they had relied on the alleged misrepresentations. <u>See In re TJX</u>, 246 F.R.D. at 396-97.

Here, in contrast, the tenants are ordinary consumers and there is no meaningful tenant-by-tenant variation in how they processed the alleged misrepresentations. The tenants simply assimilated the information provided by Roseland and RealPage and paid what they owed. In this respect, the landlord-tenant dynamic is quite simple and uniform -- and nothing like "the complex web of relationships between [retail giant] TJX and financial institutions." <u>In re TJX</u>, 524 F. Supp. 2d at 86; <u>see Moore</u> v. <u>PaineWebber, Inc.</u>, 306 F.3d 1247, 1255 (2d Cir. 2002) (holding that, given "materially uniform misrepresentations," "an individual plaintiff's receipt of and reliance upon the misrepresentation may then be simpler matters to determine"); <u>In re Pharm. Indus. Average Wholesale Price Litig.</u>, 230 F.R.D. 61, 82 (D. Mass. 2005) (Saris, J.) ("In cases involving fraudulent statements or misrepresentations, courts generally favor

certification where the misrepresentations were materially uniform, but deny certification where they varied from transaction to transaction." (citing Moore, 306 F.3d at 1253-56, discussing the Third, Fourth, Fifth, Sixth, and Seventh Circuits)).

Where class certification founders here, however, is on the Rule 23(a) requirements of typicality and adequacy of the named plaintiffs to represent the class. "Under Rule 23, the requirements of typicality and adequacy are intertwined." Swanson v. Lord & Taylor LLC, 278 F.R.D. 36, 41 (D. Mass. 2011) (Tauro, J.). "Both typicality and adequacy may be defeated where the class representatives are subject to unique defenses which threaten to become the focus of the litigation." In re Credit Suisse-AOL Sec. Litig., 253 F.R.D. 17, 23 (D. Mass. 2008) (Gertner, J.). Typicality "may also be defeated where class members have additional claims or remedies that are unavailable to the class representative." Garcia v. E.J. Amusements of N.H., Inc., 98 F. Supp. 3d 277, 288 (D. Mass. 2015) (Saris, C.J.) (citing Swanson, 278 F.R.D. at 41).

It appears that the Conleys, in an effort to create the largest possible class, have eschewed any claim of actual pecuniary damages in order to mount an attack on Roseland's practice of submetering generally. See supra, I.A. & n.1, II.B. The record, however, suggests that at least some putative class

members (as the Conleys define the broad class) may well have such claims, to the extent they might allege that Roseland's submetering practices caused them to overpay for their utilities or rent. In these circumstances, the Conleys's claims are neither typical nor adequately representative of those of the class. The Court is mindful that adequacy and typicality are "particularly important because of the res judicata implications of a class judgment." In re Credit Suisse, 253 F.R.D. at 23 (quoting Andrews v. Bechtel Power Corp., 780 F.2d 124, 130 (1st Cir. 1985)). For these reasons, the Court DENIES the motion for class certification.

## III. SUMMARY JUDGMENT[6]

The Court now takes up the parties' cross-motions for summary judgment as to the submetering claims. Because Roseland had a lawful variance for its gas submetering system, the Conleys' claims with respect to that system do not get off the

---

[6] In deciding the motions for summary judgment together with the motion for class certification, the Court observes that it failed to appreciate the variety of potential claims until it began substantively to explore the summary judgment record. This is in keeping with the First Circuit's recent guidance that "Rule 23 permits a district court, in appropriate circumstances, to defer the issue of class certification until after disposing of summary judgment motions," particularly when "consideration of summary judgment motions is likely to furnish the court the information that it needs to 'understand the case and the issues it raises.'" Danny B. ex rel. Elliott v. Raimondo, 784 F.3d 825, 837-38 (1st Cir. 2015) (alteration removed) (quoting Howe v. Townsend (In re Pharm. Indus. Average Wholesale Price Litig.), 588 F.3d 24, 40 (1st Cir. 2009)).

[16]

ground.  In addition, because the Conleys suffered no injury
from the submetering arrangement, their chapter 93A and
negligent misrepresentations claims cannot succeed.
Accordingly, as explained below, the Court GRANTS the motions of
Roseland and RealPage for summary judgment.

### C.    Standard of Review

Summary judgment is appropriate when "there is no genuine
issue as to any material fact, and . . . the moving party is
entitled to judgment as a matter of law." Saunders v. Town of
Hull, 874 F.3d 324, 326 (1st Cir. 2017) (citing Fed. R. Civ. P.
56(c)). To avoid summary judgment, an issue of material fact
"must be sufficiently open-ended to permit a rational factfinder
to resolve the issue in favor of either side." National
Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir.
1995).  The moving party bears the initial burden of showing, at
least, that "that there is an absence of evidence to support the
nonmoving party's case." Sands v. Ridefilm Corp., 212 F.3d 657,
661 (1st Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S.
317, 325 (1986)).  If this is done, the burden shifts to the
nonmoving party to show that a trier of fact could reasonably
find in her favor.  Id.  The Court must examine the entire
record in the light most favorable to the nonmoving party and
draw all reasonable inferences in her favor.  Id.  Of course,
the party bearing the burden of proof at trial cannot secure

[17]

judgment simply because the opposing party does not present contrary evidence. This is because the fact-finder could disbelieve the proffered evidence. See SEC v. EagleEye Asset Mgmt., LLC, 975 F. Supp. 2d 151, 156-57 (D. Mass. 2013) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000)).

### D. Analysis

The Court will first analyze the gas submetering claims, followed by the water submetering claims, and then turn to the claims of negligent misrepresentation.

### 1. Gas Submetering Claims

The Conleys argue that Roseland's gas submetering was unlawful for failure to comply with the Massachusetts Sanitary Code, notwithstanding the variance Roseland received from the Malden Board of Health. Pls.' Mem. Roseland 9-11. The Conleys base this charge on the memorandum from the Commonwealth's Department of Public Health declaring such variances "invalid." Id. If Roseland's variance was no good, the Conleys say, then it was illegal to charge for submetered gas because the State Sanitary Code mandated that Roseland provide gas heat without charge. Id.; see 105 CMR 410.354(A) ("The owner shall provide the electricity and gas used in each dwelling unit. . ."); 105 CMR 410.020 ("Provide means to supply and pay for").

The Conleys then claim that Roseland's gas submetering was not only unlawful but a violation of Mass. Gen. Laws ch. 93A, § 2, prohibiting "unfair or deceptive acts or practices in the conduct of any trade or commerce." The Conleys offer two textual pathways to get to a chapter 93A violation. First, 940 CMR 3.17(6)(g)(1) states: "It shall be an unfair practice for any owner who is obligated by law . . . to provide gas or electric service . . . [t]o fail to provide such service." See Pls.' Mem. Roseland 9. Second, 940 CMR 3.17(1)(i) makes it "an unfair or deceptive act or practice for an owner to . . . [f]ail to comply with the State Sanitary Code or any other law applicable to the conditions of a dwelling unit within a reasonable time after notice of a violation of such code or law from the tenant or agency." See Pls.' Opp'n Roseland 1 n.1. Despite Roseland's protestations to the contrary, see Roseland's Reply 9-10, either of these provisions suffices to bring unlawful gas submetering into the ambit of chapter 93A. See GML Corp. v. Massey, 2007 Mass. App. Div. 143, 146 (2007) (noting that "940 CMR 3.17 provides that the knowing violation of the metering regulations constitutes an 'unfair or deceptive act or practice'" within the meaning of chapter 93A). In any case, this Court need not decide whether Roseland's gas submetering would violate chapter 93A were it unlawful, because the gas submetering was in fact lawful.

Roseland contends that its gas submetering scheme <u>was</u> lawful because it properly received a variance from the Malden Board of Health. <u>See</u> Roseland's Mem. 14-18. The crux of the matter is this: Roseland maintains that the Malden variance is still good, while the Conleys argue that it was either "invalidat[ed]" by the DPH Memo, <u>see</u> Pls.' Opp'n Roseland 16, or else the variance was never valid to begin with, for the reasons mentioned in the DPH Memo, <u>id.</u> 13-14. Roseland has the better of this argument. To see why, it is necessary to establish that (1) the variance was valid and (2) that the DPH Memo had no legal effect on Roseland's variance.

The Code of Massachusetts Regulations expressly authorizes local boards of health to issue variances:

> [T]he board of health may vary the application of any provision of 105 CMR 410.000 with respect to any particular case when, in its opinion, the enforcement thereof would do manifest injustice; provided that the decision of the board of health shall not conflict with the spirit of these minimum standards or any other applicable statute, code or regulation. . . .

105 CMR 410.840(A).

Nonetheless, the Conleys argue that Roseland's variance was invalid because it conflicted with the spirit of the gas submetering regulations, since the variance is at odds with the policy underlying those regulations as interpreted by the DPH Memo. <u>See</u> Pls.' Opp'n Roseland 14. The DPH Memo explains that submetering is tantamount to "the resale of electricity and

gas," which the Department of Public Utilities has banned because "tenants should be direct customers of the gas or electric utility and thus receive all the consumer protections enforced by [the Department of Public Utilities]." DPH Memo 1.

This argument does not move the Court to strike down the variance issued by the Malden Board of Health as against "the spirit" of the regulations. Even if the regulations' "spirit" is what the Conleys portray it to be, that only describes a _general_ policy. A variance by its nature is always in tension with the general rule; the important question is whether anything specific to the case justifies the deviation. The Malden Board of Health presumably made such a _case-specific_ determination, as it had full authority to do. The Conleys have offered no reason to disturb that determination apart from reiterating the rule's general policy. With no reason to do otherwise, this Court respects the Board of Health's decision.

The DPH Memo gives rise to a second attack on Roseland's variance as "prohibited by statute." DPH Memo 1.[7] Section 335 of chapter 164 of the Acts of 1997 ("the Electricity Restructuring Act") provides:

> Notwithstanding any general or special law, rule, or
> regulation, to the contrary, the operation in rental

---

[7] Although the Conleys fail to make this argument with particularity, they do repeatedly point to the DPH Memo, which itself relies in part on a purported statutory prohibition of energy submetering.

housing of an energy monitoring system installed prior to July 1, 1997, whereby the cost of heat or air conditioning is allocated or charged by the owner to the tenant based upon measurements made by a computerized monitoring system and pursuant to a rental agreement shall be permitted.

The DPH Memo parses this statute to imply a <u>prohibition</u>, asserting that "[t]his Act only permits such systems installed in rental housing prior to July 1, 1997, and any such systems installed after that date are prohibited by statute." DPH Memo 1. Yet this is a clear misreading of the statute, which says nothing about a prohibition. By way of background, it should be noted that the Electricity Restructuring Act was introduced and enacted in November 1997, just one month after the Massachusetts Superior Court held, while deferring to an earlier Department of Public Health memorandum, that gas submetering ran afoul of the Sanitary Code regulations. <u>See</u> <u>Freeman</u> v. <u>Massachusetts Inst.</u> <u>of Tech.</u>, No. 97-00179, 1997 Mass. Super. LEXIS 59, at *9-*13 (Mass. Super. Ct. Oct. 21, 1997) (Fabricant, J.). Addressing this specter of ballooning regulation, section 335 of the Electricity Restructuring Act was designed to <u>immunize</u> existing submetering systems from regulatory restrictions. That is all it does; it prohibits nothing.[8]

---

[8] The Department of Public Health is not entitled to deference in interpreting the Electricity Restructuring Act, since the agency that administers that Act is the Department of Public Utilities. <u>See</u> <u>Pharmaceutical Research and Mfrs. of Am.</u> v. <u>Concannon</u>, 249 F.3d 66, 75 (1st Cir. 2001) ("As the

Having decided that the variance was initially valid, it remains for the Court to determine what effect, if any, the DPH memo had on the variance. The Conleys occasionally speak of the DPH Memo as an independent source of binding law. See Pls.' Opp'n RealPage 2 (contending that "in 2013 the DPH issued a regulatory prohibition on reselling of utilities or submetering"). Not so. The Department of Public Health must obey its own regulations and has no power to override the Code of Massachusetts Regulations by way of fiat or memorandum. See, e.g., Manor v. Superintendent, Mass. Corr. Inst., Cedar Junction, 416 Mass. 820, 824, 626 N.E.2d 614 (1996) ("[C]ourts will not hesitate to overrule agency interpretation of rules when those interpretations are . . . inconsistent with the plain terms of the rule itself.") (citation omitted); Carey v. Commissioner of Corr., 479 Mass. 367, 369, 95 N.E.3d 220, 223

---

Department is charged with administering the Maine Rx Program, we owe deference to its interpretation of the Act."); cf. City of Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 94 (1st Cir. 2008) ("Federal courts generally defer to a state agency's interpretation of those statutes it is charged with enforcing, but not to its interpretation of federal statutes it is not charged with enforcing."); Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612, 1629 (2018) (refusing to defer to federal agency interpretation "of a second statute it does not administer"). Yet deference or no deference, the DPH Memo's interpretation of chapter 335 of the Electric Restructuring Act is contrary to the statute's plain meaning and is therefore of no effect. See Protective Life Ins. Co. v. Sullivan, 89 F.3d 1, 4 (1st Cir. 1996) (disregarding state "Commissioner's interpretation of [state] insurance law" when "Commissioner's interpretation is contrary to the language and policy of the statute").

(2018) (same); cf. United States ex rel. Accardi v. Shaughnnesy, 347 U.S. 260, 247 (1954) (agency must follow its own regulations). The question, then, is whether the variance was somehow revoked in a manner consistent with the regulations.

The Code of Massachusetts Regulations explains that a variance may be "revoked . . . only after the owners and affected occupants have been notified in writing and have been given an opportunity to be heard." See 105 CMR 410.840(B). Roseland argues that even if the DPH Memo may be construed as a revocation of the variance, within the meaning of the regulations, that revocation was meaningless because Roseland was never notified in writing nor given the opportunity for a hearing. Roseland's Mem. 16-17. The Conleys respond that Roseland was, in fact, notified via email in September 2013 when Malden's Director of Public Health forwarded the DPH Memo to Roseland's attorney; and that the Conleys could have asked for a hearing but chose not to. Pls.' Opp'n Roseland 17-18.

This Court need not decide whether Roseland was properly "notified in writing" and given an opportunity to be heard respecting a revocation (although it is doubtful that merely forwarding the DPH Memo satisfied those requirements), since it is beyond dispute that the affected occupants of the buildings were never notified or afforded the chance to be heard. This plainly violated the regulation and deprived the residents of

Roseland's properties the chance to advocate for a submetering system, which may well have been to their advantage as a means of reducing rent and controlling energy usage. See Freeman, 1997 Mass. Super. LEXIS 59, at *12 (explaining tenants' interest in submetering). Accordingly, Roseland's variance was never revoked in a manner that complies with the regulations and it thus remains valid.

The upshot of this analysis is that Roseland's gas submetering activities were lawful. See id. at *13 (holding that variance issued by municipal agency exempted building from ordinary gas submetering regulation). Therefore, the Conleys' claims regarding gas submetering must fail.

### 2. Water Submetering Claims -- Chapter 93A

The Conleys next allege that Roseland's water and sewer submetering systems were unlawful because they failed to comply with the statutory and regulatory requirements, especially filing the appropriate certification forms. See Pls.' Mem. Roseland 4-6; Mass. Gen. Laws ch. 186, § 22; 105 CMR 410.354(D).[9]

---

[9] Mass. Gen. Laws ch. 186, § 22(c) provides: "A landlord may charge a tenant of a dwelling unit for water usage as measured through the use of submetering equipment only in accordance with this section and only upon the landlord certifying that the dwelling unit is in compliance with this section to a board of health, health department or other municipal agency or department charged with enforcement of the state sanitary code. All provisions of this section allowing landlords to charge tenants for water usage shall also be deemed to apply to sewer service charges calculated by means of the same primary meter or

Roseland concedes this point, responding only that the violation was "purely technical" and has since been remedied. Roseland's Reply 10.

The violation may be purely technical, and it may be nothing more than a "failure to fill out a one-page form." Id. 1. Yet technical violations matter. It was consequently unlawful for Roseland to have charged the Conleys for submetered water and sewer utilities. The Conleys further argue that Roseland was legally obligated to provide the Conleys with water and sewer utilities free of charge. Pls.' Mem. Roseland 14-15; see 105 CMR 410.180 ("The owner shall provide, for the occupant . . . a supply of potable water sufficient in quantity and pressure to meet the ordinary needs of the occupant. . . ."); 105 CMR 410.020 ("Provide means to supply and pay for"). Roseland's practice of unlawfully charging the Conleys for such utilities, the Conleys allege, is "unfair or deceptive" within the meaning of chapter 93A. Pls.' Mem. Roseland 15.

---

submeter. Certification by the landlord shall be provided under the penalties of perjury and shall include a statement that: 1) the dwelling unit is eligible for the imposition on the tenant of a charge for water usage in accordance with paragraph (d); 2) all showerheads, faucets, and water closets in the dwelling unit are water conservation devices and that all water closets were installed by a licensed plumber; and 3) the water submeter measuring the use of water in the dwelling unit was installed by a licensed plumber and is in compliance with the standards of accuracy and testing referenced in subsection (b)."

There are two major flaws with the Conleys' chapter 93A argument. First, they have failed to explain how an accidental, technical violation of the regulations becomes an unfair or deceptive act within the meaning of chapter 93A. As Roseland explains in rebuttal, the provisions of the Code that converted the Conleys gas submetering claims into chapter 93A issues are inapplicable to this context. See Roseland's Reply 9-10. That's because 940 CMR 3.17(6)(g) applies only to "gas or electric service," not water or sewer; and 940 CMR 3.17(1)(i) makes violation of the Sanitary Code an unfair or deceptive act only "within a reasonable time after notice of a violation of such code or law from the tenant or agency." It is undisputed that Roseland was unaware of the violation until notified by the Conleys in December 2017, see Roseland's Demand Letter Reply 4, ECF No. 74-33, and then Roseland filed the appropriate forms in March 2018, Pls.' Statement Facts ¶ 28. That seems like "a reasonable time." Accordingly, the regulations do not transform Roseland's conduct into unfair or deceptive acts.

Nor is Roseland's conduct within chapter 93A's freestanding "unfair or deceptive acts" prohibition. Simple negligence does not ordinarily implicate chapter 93A, as interpreted by Massachusetts courts; the conduct must be "extreme or egregious." Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 62, 809 N.E.2d 1017, 1032 (2004); Baker v. Goldman, Sachs &

Co., 771 F.3d 37, 51 (1st Cir. 2014) (same and collecting cases). Roseland's conduct is in the heartland of mere negligence and thus out of chapter 93A territory.

The second major problem with the Conleys' chapter 93A claim is that they were not injured within the meaning of the statute. See Mass. Gen. Laws ch. 93A, § 9(1) (permitting person "injured by another person's" unfair or deceptive commercial act to bring action in superior court); Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 823, 17 N.E.3d 1066, 1077 (2014) ("The injury requirement of G.L. c. 93A is designed to guard against vicarious suits by self-constituted attorneys general who see a wrong but have not actually been harmed by the wrong.") (citation omitted).

True, "Massachusetts case law construing the Chapter 93A, § 9(1) injury requirement has had a less than intellectually coherent course of development." Rule v. Fort Dodge Animal Health, Inc., 604 F. Supp. 2d 288, 298 (D. Mass. 2009) (Woodlock, J.). Yet ever since Tyler v. Michaels Stores, Inc., 464 Mass. 492, 984 N.E.2d 737, 984 N.E.2d 737 (2013), the Supreme Judicial Court has settled on the principle that a regulatory violation per se does not create an injury for chapter 93A purposes; rather, the violation "must cause the consumer some kind of separate, identifiable harm arising from the violation itself." Id. at 745. Or, as the First Circuit

glossed, there is no injury under chapter 93A when the consumers have "received everything they bargained for and faced no future risk of harm." Shaulis, 865 F.3d at 10.

Here, the Conleys received exactly what they bargained for in their lease: paying their utilities separately, according to their usage. A recent case is instructive. In Bellermann v. Fitchburg Gas & Elec. Light Co., 475 Mass. 67, 54 N.E.3d 1106 (2016), the plaintiffs claimed to have "suffered economic injury by overpaying for a level of emergency preparedness required by [the Department of Public Utility's] regulations, which [the electric company] unfairly and deceptively failed to provide, although the rates charged were based on [the electric company's] assumed compliance with those regulations." Id. at 1108. The emergency never occurred, but the plaintiffs claimed injury for paying for preparedness that did not exist. The Supreme Judicial Court rejected this theory, reasoning that the plaintiffs "would have paid the same amount for compliant electric service as they did pay" and that there was no injury in "purchasing a service that might have failed to provide them with emergency response services, in circumstances that never happened." Id. at 1114 (footnote omitted).

The Conleys' claim of injury suffers from the same fatal flaw as that of the plaintiffs in Bellermann. The submetering regulations provide a kind of safety net for utility consumers,

forcing landlords to formally certify that the equipment is proper or ensuring that consumers are direct customers of the utility companies who benefit from various regulatory protections. In theory, if the Conleys' water or gas utilities had broken down or were wrongly shut off, that safety net would have been less secure. Here, however, the Conleys' gas got hot and their water flowed -- no breakdown ever happened. Just as the electricity consumers in Bellermann were not injured without an emergency, the Conleys were not injured without some interruption of service that compliance with the regulations might have spared them.

The Conleys try to avoid the force of this argument with a clever maneuver. They contend that they were not required to pay at all for unlawfully submetered utilities, so this is not a case of paying for a safety net that was never needed -- it is paying for a service that by law should have been free. See Pls.' Mem. Roseland 17 (arguing injury by accusing Roseland of "foisting upon each tenant costs for which they were not legally required to pay"). In short, the Conleys allege that they were tricked into buying a product which Roseland was legally obligated to provide them free of charge. If one ignores the lease as a whole and looks at the utilities arrangement in isolation, the Conleys seem to have a good point. After all, it is legally correct that the utilities contract was unenforceable

to the extent it violated state law, and thus each month the Conleys technically did not owe any money for the services they were using. See Lezberg v. Rogers, 27 Mass. App. Ct. 1158, 1159, 539 N.E.2d 89, 90 (1989) (holding that landlord who failed to comply with submetering regulations "may not recover from the defendant any part of the charges for electricity used"). Despite this fact, Roseland (and perhaps also RealPage) induced the Conleys and other tenants to pay each month under the illusion that they were required to do so. According to the Conleys, this is a clear injury.

Yet if one takes a step back and regards the lease as a whole, it becomes plain that the Conleys suffered no injury. For any given unit leased, the ultimate cost of rent and utilities combined will be determined by typical market forces. Rudimentary economics teaches that landlords burdened with providing utilities will charge higher rent. Conversely, the rent in units such as the Conleys' will be proportionately discounted because the tenants must pay separately for utilities. Cf. Freeman, 1997 Mass. Super. LEXIS 59, at *12 (noting that submetering is arguably "more consistent with the both the tenants' interests and the public interest than the alternative of charging higher rent with utilities included"). The unmistakable intent and effect of the Massachusetts regulations, then, is not to lower the bottom-line rent but to

provide landlords with a choice: either submeter the utilities in accordance with the law or build those charges into the rent. When, as here, the landlord fails to do either, the tenants' injury must be measured against those two realistic options, not against a tenant's fantasy of fully free utilities without a concomitant increase in rent. As with lunch, there is no free gas and water. Thus, any injury to the tenants must be shown by reference to the legally acceptable alternatives -- that is, would the Conleys have paid less had Roseland either submetered in accordance with the regulations or elected to build utilities into the rent?

This method of determining injury in a case of regulatory noncompliance is consistent with the analysis of the Supreme Judicial Court in such cases, which asks whether the consumers are "worse off . . . than [they] would have been had the [agreement] complied in full" with the regulations. Bellermann, 475 Mass. at 77, 54 N.E.3d at 1113 (quoting Hershenow v. Enterprise Rent-A-Car Co. of Boston, 445 Mass. 790, 800-01, 840 N.E.2d 526, 535 (2006)). Here, in the First Circuit's words, the Conleys "received everything they bargained for," which is "a primary rationale" for the Supreme Judicial Court's decisions on this issue. Shaulis, 865 F.3d at 11. The Conleys are not worse off now than they would have been had Roseland filed the appropriate forms for water and sewer utilities or complied with

the gas submetering regulations (putting aside the question of the variance). Nor do the Conleys allege that their rent was higher than fair rental value, i.e., the price of a typically discounted utilities-not-included apartment. Cf. Freeman, 1997 Mass. Super. LEXIS 59, at *15 (holding that, in submetering violation case, "the measure of damages is . . . the combination of rent and additional charges for utilities, that exceeded the fair rental value of the units with heat, air conditioning, and hot water included"). Therefore, the Conleys got exactly what they bargained for and were not injured within the meaning of chapter 93A.

### 3. Negligent Misrepresentation Claims

On a negligent misrepresentation action in Massachusetts, "a plaintiff must prove that the defendant (1) in the course of his business, (2) supplied false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance on the information, and that he (6) failed to exercise reasonable care or competence in obtaining or communicating the information." Gossels, 453 Mass. at 371-72, 902 N.E.2d at 377; see Braunstein v. McCabe, 571 F.3d 108, 126 (1st Cir. 2009) (quoting test).

The Conleys have brought negligent misrepresentation claims against both Roseland and RealPage, FAC ¶¶ 119-131 (gas

submetering); ¶¶ 169-181 (water and sewer submetering), though they have moved for summary judgment on these claims only against RealPage, ECF No. 76; for their part, both Roseland, ECF No. 77, and RealPage, ECF No. 82, have moved for summary judgment on all negligent misrepresentation claims.

Nowhere in the Conleys' many filings in this case do they explain how they believe Roseland's conduct amounted to negligent misrepresentation. The Conleys raised the allegations in their initial complaint in barebones form, FAC ¶¶ 119-131; ¶¶ 169-181, but they have not addressed the issue since, despite Roseland's motion for summary judgment on these counts and its supporting memorandum, see Roseland's Mem. 18-20. The Conleys have somewhat clarified their claims of negligent misrepresentation against RealPage, see Pls.' Mem. RealPage 3-9, and their claims against Roseland are presumably of a substantially similar nature.

The essence of the Conleys' argument is that, by sending monthly bills, Roseland falsely represented that the Conleys owed Roseland money for the utilities and induced the Conleys to pay -- when, because of the regulatory violations, the Conleys did not legally owe Roseland a cent for utilities. See id; FAC ¶ 124 ("Defendants' misrepresentation as to the permissible nature of payment for submetered gas services caused the Conleys to act to their financial detriment."); id. ¶ 174 (same for

submetered water and sewer services). In its motion for summary judgment on these claims, Roseland argues (1) that it did not make any false representations of _fact_, but only of law; (2) that the Conleys could not actually and justifiably have relied on any misrepresentations because they only "skimmed" the lease; and (3) that the Conleys suffered no pecuniary loss as a result of any misrepresentations because they fully received their utilities. Roseland's Mem. 18-20.

The Court will skip over Roseland's first two arguments, which are weak in any case, because its final argument -- that the Conleys suffered no pecuniary loss as a result of any misrepresentation -- hits the mark. The Conleys got what they paid for, and they do not allege that the price was unfair. Rather, their grievance is that because of Roseland's lapses in regulatory compliance they were legally entitled to free utilities and yet were tricked by Roseland into paying. This is the same theory of injury that the Conleys asserted for their chapter 93A claims. It should fare no better on this tort claim. See Shaulis, 865 F.3d at 15 ("[Plaintiff]'s claim for fraudulent misrepresentation fails for the same reason as her Chapter 93A claim: she has not alleged an actionable injury caused by [defendant]'s allegedly false statement. . . . [S]he does not allege that the sweater she actually received was worth less than she paid, or that the sweater was defective in some

way."). Nor can the Conleys plausibly assert it was unjust to pay for the utilities they used. Cf. Kiluk v. Select Portfolio Servicing, Inc., No. 11-10731-FDS, 2011 WL 8844639, at *5 n.14 (D. Mass. Dec. 19, 2011) (Saylor, J.) ("Requiring plaintiffs suffer a pecuniary loss in a claim for negligent misrepresentation helps to ensure that they are compensated only as much as is needed to avoid injustice." (citing Restatement (Second) of Torts § 552B cmt. b)); Nycal Corp. v. KPMG Peat Marwick LLP, 426 Mass. 491, 495-97, 688 N.E.2d 1368 (1998) (adopting and quoting test of Restatement). Accordingly, the pecuniary loss element of the negligent misrepresentation claim is lacking.

In sum, because the Conleys suffered no pecuniary loss, the Court GRANTS the motions for summary judgment of Roseland and RealPage on the negligent misrepresentation claims.[10]

---

[10] This is not to say that tenants are wholly without remedy for negligent violations of the gas and water submetering regulations. The Code of Massachusetts Regulations provides a mechanism for relief. After the landlord is cited by the state agency for violations of the Sanitary Code pertaining to utility submetering, the landlord is responsible for paying the utility bills retroactively for up to two years, and the utility company must place that money in an escrow account in the tenant's name. See 220 CMR 29.06. The regulations thus do what the common law may not. Cf. Huard v. Forest St. Hous., Inc., 366 Mass. 203, 208, 316 N.E.2d 505, 508 (1974) (refusing to consider "the tenant's common law right to recover amounts voluntarily paid" to landlord under a false representation of legal obligation when "a clear statutory remedy" existed).

## IV. CONCLUSION

The plaintiffs in this case seek to place their former landlord and its billing contractor on the hook for years of submetered utilities that did not comply with state regulations. The Court holds these claims have no merit. The plaintiffs' claims are deficient in several respects. First, the gas submetering was lawful because the variance was validly granted and never properly revoked. Second, the water and sewer regulatory violations were merely negligent and did not rise to a violation of chapter 93A. Third, the plaintiffs suffered no injury or loss for purposes of chapter 93A or negligent misrepresentation because they got what they bargained for.

Accordingly, the Court DENIES the motion for class certification, ECF No. 47; GRANTS the motions for summary judgment filed by Roseland, ECF No. 77, and RealPage, ECF No. 82; and DENIES the Conleys' motions for summary judgment, ECF Nos. 73, 76. Judgment will be entered for the defendants so declaring.

**SO ORDERED.**

_William G. Young_
WILLIAM G. YOUNG
DISTRICT JUDGE